# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cr. No. 06-20033-STA |
| ) | |
| DANIEL SCOTT OGDEN, ) | |
| ) | |
| Defendant. ) | |

## ORDER OF RESTITUTION

Before the Court is the government's request for restitution made during the sentencing hearing conducted on December 4, 2009. The United States filed a supplement (D.E. # 271) to its position regarding the pre-sentence report on the issue of restitution alone. The Court conducted a hearing on restitution on March 3, 2010. For the reasons set forth below, the request for restitution is **GRANTED**.

## BACKGROUND

On October 6, 2008, a jury convicted Defendant of one count of sexual exploitation of a minor pursuant to 18 U.S.C. § 2251(a); one count of using the internet to persuade a minor to engage in sexual acts in violation of state law pursuant to 18 U.S.C. § 2422(b); one count of possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B); six counts of receiving child pornography in violation of 18 U.S.C. § 2252(a)(2); and a forfeiture count. On December 4, 2009, the Court sentenced Defendant to a total term of imprisonment of two hundred four (204) months, the sentence as to each count to be served concurrently.

1

The victim, S.S., submitted a victim impact statement, in which she sought $68,000 in restitution. Since the preparation of that statement, the United States has increased the amount sought to $110,380.00, to include a claim for future medical treatment and medication in the amount of $42,380.00. The government argued that this amount represented the victim's property loss, monetary loss, lost income, and future medical treatment and medication. As this case involved the sexual exploitation of a minor, restitution is mandatory. Furthermore, restitution should include the victim's future medical expenses. The United States contends that relying on expert testimony, courts are willing to grant restitution for future counseling expenses even though they are reluctant to award other future losses such as lost income. Restitution awards to minor victims have averaged $50,000, which corresponded to the presumptive amount of damages set forth in 18 U.S.C. § 2255.[1]

At the hearing on restitution, the Court received testimony from three witnesses and heard additional argument from counsel. The government introduced the testimony of Dr. John Hutson ("Dr. Hutson"), a psychologist in Memphis, Tennessee. Dr. Hutson interviewed the victim and her mother, reviewed the victim's mental health records, and spoke with the victim's counselor in California, Amanda McClintock ("McClintock"). Dr. Hutson testified that the victim had individual counseling and psychotherapy from ages 17 to 19. The victim was diagnosed with post-traumatic stress disorder ("PTSD") and began a regimen of paxil (for depression), topamax (a mood stabilizer), and trazodone (a sleep aid). At age 17, the victim had overdosed on her medications in an apparent effort to take her own life. McClintock opined to

---

[1] The statute provides the victim of certain crimes, including the crimes of which Defendant was convicted in this case, with a civil remedy against their exploiter. The statute has since been amended to raise this presumptive amount to $150,000.

Dr. Hutson that counseling had been beneficial to S.S.. Upon reaching age 18, S.S. discontinued therapy because she was no longer covered by her mother's health insurance plan. According to Dr. Hutson, both McClintock and the victim believe that additional treatment would be beneficial. Dr. Hutson opined that based on the victim's diagnosis of PTSD with a moderate impairment, S.S. would require individual counseling for a two-year period with fifty (50) sessions per year at $125.00 per session. She would also require a two-year period of weekly group counseling sessions at $50 per session, for a total of $5,200.00. Thereafter, she would attend group counseling on a monthly basis for the next five years. Dr. Hutson testified that S.S.'s total costs for counseling would equal approximately $25,000.00. Over a ten-year period, Dr. Hutson testified that S.S.'s medication costs would total $10,380.00 with an additional $7,000.00 for psychiatric contact.[2] In short, Dr. Hutson estimated that S.S.'s future medical expenses for the next ten years would equal $42,380.00.

On cross-examination, Dr. Hutson admitted that he relied on information from McClintock who practices in California. McClintock had not counseled the victim in the two years since her insurance coverage lapsed. At the time that Dr. Hutson spoke with McClintock, McClintock did not have S.S.'s records with her. Dr. Hutson testified that the symptoms of PTSD include depression, withdrawal from social situations, flashbacks, a desire to avoid anything which might remind the victim of the traumatic event, and the experience of reliving

---

[2] Dr. Hutson opined that a patient with PTSD would require medication for a period of ten years. Based on S.S.'s prescribed medication, Dr. Hutson estimated that she spend a total of $86.50 per month for ten years on Paxil ($4), Topamax ($75), and Trazodone ($7.50). Dr. Hutson also testified that as long as she took this medication, S.S. would require a psychiatrist contact, monthly for the first two years, and then every six months for the next eight, at a total cost of $7,000.00 over ten years.

the traumatic event.  According to Dr. Hutson, PTSD tends to wain over time but may persist for a long time or be inflamed by re-exposure to certain stimuli.  Dr. Hutson stated that S.S. was admitted to the hospital on two occasions after her encounter with Defendant.  Her first admission was for her depression over a possible sexual assault unrelated to her encounter with Defendant.  Within weeks of her first hospital treatment, S.S. made the attempt on her life and went back to the hospital.

The government's next witness was Melissa Stahl ("Stahl"), the mother of the victim. Stahl testified that her daughter's claim for $5,000 in property loss included two desk-top computers and one then-brand new laptop computer seized by the police when they began investigating Defendant.  To date that property has not been returned.  Stahl also stated that some of her daughter's personal belongings were seized such as a cell phone, clothing, and jewelry. The $1,000 in monetary loss resulted from cash that S.S. gave Defendant when he met her in San Francisco to pay for the hotel room Defendant had reserved with his credit card.  S.S. wanted Defendant to travel to California because she believed that Defendant had cancer.  Stahl testified to her daughter's mental health since the encounter with Defendant.  S.S. was age 14 or 15 when her relationship with Defendant began.  Stahl described the changes in her daughter since that time as dramatic.  Before, S.S. was charismatic, competitive, ambitious, motivated, and athletic. Her daughter had auditioned for placement at a competitive performing arts schools where she was involved in dance, singing, and theater.  Outside of school, S.S. was part of a cheer team. Stahl commented that her daughter had once aspired to be a child psychologist.  Since this experience, though, S.S. has completely withdrawn from family and personal relationships.  She quit her activities and ultimately dropped out of school.  She has trouble sleeping and suffers

from night terrors.  She has been unable to maintain unemployment having over five jobs in a short span of time, none lasting more than four months.  S.S. attempted suicide by taking too many of her own medications.  She stayed at a mental treatment facility for nine days and required additional outpatient treatment.  S.S. could no longer pay for therapy and counseling after her insurance stopped.  Stahl testified that her daughter would not get out of bed on some days and began to gain weight.

Stahl admitted that her daughter had completed course work for her high school diploma as well as a vocational program in aesthetics.  Yet S.S.'s several attempts to start at a junior college have been unsuccessful.  Stahl has observed some improvement in her daughter's emotional state: she has maintained a job at Macy's for several months and lost some weight.  S.S. maintains her own residence with financial support from her mother.  She still tends to become very emotional without any observable cause.  Stahl reported that S.S. has called her pleading for help and begging for medications.

With respect to S.S.' request for lost wages, Stahl testified that the claim for $62,000 was based on the following assumptions: $12,000 in earnings from ages 16 to 18 (minimum wage at approximately 20 hours per week) and $50,000 in earnings from ages 18 to 20 (working a full-time position with an associate of arts degree at $25,000 per year).

Finally, the Court heard testimony from S.S. herself, now age 20.  S.S. stated that she was age 15 when she first met Defendant on-line.  After her sixteenth birthday, the victim began working at Baskin-Robbins with the intent to earn money to pay for Defendant's trip to California.  S.S. testified that she left approximately $1,000, less $40 for cab fare, in cash with Defendant in the hotel room they shared in San Francisco.  She has never received her personal

property back. Nor has she been able to maintain employment, a fact she attributed to her lack of trust and inability to develop appropriate relationships with co-workers. S.S. stated that following her encounter with Defendant, she stopped going to school and then dropped out. She quit her dance team and eventually withdrew from all of her friendships. Eventually she completed her diploma via a home study course where she met with a teacher at a public library once a month. S.S. stated that she once wanted to be a child psychologist. Due to the fact that Defendant used to help her draft school assignments and send her to the library for research, she no longer has any desire to pursue studies.

S.S. testified that she began taking medication and then overdosed because of the trauma and the night terrors she experienced. S.S. was admitted to a mental health facility where she stayed nine or ten days. She continued outpatient therapy with a counselor Amanda McClintock. When her insurance coverage stopped, she stopped counseling. S.S. admitted that she continues to experience extreme emotional swings. She also addressed the incident she experienced where she blacked out and awoke after a sexual encounter. Fearing she had been sexually assaulted, S.S. went to a hospital for treatment. S.S. testified that her suicide attempt occurred after this event. Nevertheless, S.S. has worked at Macy's since November 2009 and lives on her own. She has tried to work as a receptionist at a salon her mother bought. She has attempted to start college three times but dropped out each time.

Defendant did not call any witnesses of his own at the restitution hearing.[3]

---

[3] The Court notes that Defendant had counsel at the time he filed his Notice of Appeal on December 15, 2009. Counsel was granted leave to withdraw by the Sixth Circuit on January 27, 2010. The Sixth Circuit later appointed new appellate counsel for Defendant on February 8, 2010. The Court then set the hearing on restitution, which was eventually convened on February 26, 2010. At that time Defendant appeared pro se, and the Court decided that it should appoint

## ANALYSIS

For crimes involving the sexual exploitation of children, restitution is mandatory.[4]

The Court must order restitution by directing Defendant to pay the victim "the full amount of the victim's losses" as determined by the court.[5] A "victim" is defined to include the individual harmed as a result of the crime including the victim's legal guardian.[6] Losses include costs incurred by the victim for (1) medical services relating to physical, psychiatric, or psychological care; (2) physical and occupational therapy or rehabilitation; (3) necessary transportation, temporary housing, and child care expenses; (4) lost income; (5) attorneys' fees, as well as other costs incurred; and (6) any other losses suffered by the victim as a proximate result of the offense.[7] A restitution order under § 2259 should be issued in accordance with the Mandatory Victims Restitution Act ("the MVRA"), 18 U.S.C. § 3663A.[8] The Court is not to consider the defendant's ability to pay or the fact that the victim is entitled to compensation from the proceeds of insurance.[9] Consistent with the MVRA, the government has the burden to prove

---

counsel for the restitution hearing. The Court appointed counsel the same day and continued the hearing until March 3, 2010. At the hearing, appointed counsel argued that he had little time to prepare for the hearing or arrange for any witnesses in light of his very recent appointment. Nevertheless, the hearing proceeded.

[4] 18 U.S.C. § 2259.

[5] § 2259(b)(1).

[6] § 2259(c).

[7] § 2259(b)(3).

[8] § 2259(b)(2).

[9] § 2259(b)(4)(B).

7

such loss by a preponderance of the evidence.[10]

In this case Defendant was convicted of multiple counts related to the sexual exploitation of a minor. The Court finds that restitution is mandatory for the specific crimes Defendant committed. It is undisputed that the victim in this case was S.S., a minor female at the time of the offenses who was harmed as a result of Defendant's crimes. Although there must be "a causal connection between the offense of conviction and the victim's harm" before awarding restitution, the courts have not "imposed a requirement of causation approaching mathematical precision" when determining the amount of restitution that is appropriate.[11] Rather, the courts apply the "slightly relaxed standard" of "a rule of reasonableness."[12] This less rigid approach is justified in light of "the strong Congressional intent behind section 2259."[13]

Based on these factors, the Court finds that the victim in this case is entitled to the following forms of restitution. First, the government has established by a preponderance of the evidence that S.S. suffered a property loss equal to $5,000.00 as a proximate result of Defendant's crimes. The testimony showed that the police seized two desktop computers and one then-brand new laptop computer from S.S.'s home as part of the investigation into Defendant's criminal acts. Although Defendant correctly pointed out that the victim may request the return of the equipment upon the completion of these proceedings, the Court finds that S.S.

---

[10] *See* 18 U.S.C. § 3664(e). *See also United States v. Vandeberg*, 201 F.3d 805 (6th Cir. 2000).

[11] *United States v. Doe*, 488 F.3d 1154, 1159-60 (9th Cir. 2007)

[12] *Id.* at 1160; *United States v. Brunner*, No. 5:08cr16, 2010 WL 148433, at *3 (W.D.N.C. Jan. 12, 2010)

[13] *United States v. Danser*, 270 F.3d 451, 455 n.5 (7th Cir. 2001).

and her family have been denied the benefit of the computers in the years since the investigation began. Owing to the nature of personal computers, it is unlikely that the machines possess the same utility or value they did in 2006. Likewise, there was testimony that the victim was deprived of other property such as jewelry, a cell phone, clothing, and other effects. Both S.S. and her mother testified that the approximate value of the property at the time of the crimes was $5,000.00. Based on this evidence, the Court finds that the victim's property losses were the proximate result of Defendant's crimes. As a result, the victim is entitled to restitution for the loss of her property in the amount of $5,000.00.

Next the Court finds that the government has established S.S.'s loss of almost $1,000.00 in cash. According to the victim, she gave Defendant nearly $1,000.00 for the cost of the hotel room where they stayed in San Francisco. S.S. testified that she left the money with Defendant and kept around $40 for her cab ride home. The Court finds that the full amount of $1,000.00, including her cab fare, was incurred as a proximate result of Defendant's crimes. Therefore, S.S. is entitled to monetary losses in the amount of $1,000.00.

As for future medical treatment, the proof shows that S.S. has been diagnosed and treated for PTSD. McClintock, S.S.'s counselor in California, informed Dr. Hutson that S.S. suffered from PTSD. Dr. Hutson testified that the symptoms of PTSD include depression withdrawal from social situations, flashbacks, a desire to avoid anything which might remind the victim of the traumatic event, and the experience of reliving the traumatic event. Both S.S. and her mother testified that S.S. has experienced most of these symptoms including depression and night terrors from the time of her encounter with Defendant in San Francisco. All of the testimony, including S.S.'s own, agreed that S.S. would benefit from future medical treatment.

While not seriously challenging her PTSD diagnosis, Defendant did question S.S. about another possible cause of her PTSD. S.S. admitted that after her encounter with Defendant, she had had an incident in which she blacked out. When she came to, S.S. found herself "with someone on top of her." She sought medical treatment and feared that she had been sexually assaulted. Defendant suggested that she might have experienced PTSD as a result of this episode. The Court finds this theory totally without support or merit. The proof at trial showed that S.S. met Defendant on-line where Defendant sought out a relationship with her and worked to gain her trust and sympathy through a series of lies about his age and his health, including that he suffered from cancer. Defendant ultimately took advantage of S.S.'s trust for the purpose of meeting her for a sexual encounter. S.S. testified that her night terrors were flashbacks to her relationship with Defendant. She also stated that since that time, she has never been able to maintain normal healthy relationships. Based on her testimony about the emotional problems she immediately began to suffer from after Defendant victimized her, the Court finds that the government has established by a preponderance that S.S. suffered from PTSD as a result of the acts for which Defendant has been convicted.

Accordingly, S.S. is entitled to restitution for medical services including future psychiatric care.[14] Dr. Hutson estimated that in his expert opinion, the amount of future medical care in S.S.'s case would be $42,380.00. This amount includes medication over a ten-year period ($17,380.00), individual and group counseling for two years, and then periodic group

---

[14] *United States v. Pearson*, 570 F.3d 480, 486 (2d Cir. 2009); *Doe*, 488 F.3d 1154 at 1159-60; *Danser*, 270 F.3d at 455 (7th Cir. 2001); *United States v. Julian*, 242 F.3d 1245, 1246-48 (10th Cir. 2001); *United States v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999) ("Congress was well aware that children victimized by sexual abuse often do not recover quickly from their injuries."). *See also United States v. Estep*, 378 F. Supp. 2d 763, 773 (E.D. Ky. 2005).

counseling for five years more. The Court finds that there is a discrepancy in the calculations Dr. Hutson submitted concerning counseling services. Dr. Hutson opined that $25,000 of the total cost would be required for individual and group counseling. Of that amount, $12,500.00 was needed for individual counseling sessions at $125.00 per session for 50 weeks per year for two years. At the same time, Dr. Hutson testified that S.S. would also require weekly group sessions for the same two-year span, which at $50 per session would equal $5,200.00. Dr. Hutson believed that another five years of monthly group sessions would be necessary, that is 60 sessions at $50.00 per session, resulting in $3,000.00 of expense. Based on this testimony, the Court concludes that the cost of therapy would total $20,700.00, not $25,000.00. Therefore, adding the other amounts to which Dr. Hutson testified, the Court finds that S.S. is entitled to restitution for future medical expenses in the amount of $38,080.00.[15]

Finally, S.S. seeks restitution for lost income since age 16. The issue is what lost wages are available to the victim of crimes involving the sexual exploitation of a minor under § 2259. On the one hand, § 2259 states that a restitution order should be issued in accordance with the MVRA, a statute which permits restitution of lost income only under specific circumstances.[16] For example, a victim may recover lost income under the MVRA only in cases involving bodily injury or for wages lost while participating in the investigation or prosecution of the offense and attending proceedings related to the offense.[17] Reading § 2259 in light of the MVRA then,

---

[15] The Court further notes that a victim may be able to secure compensation for further unforeseen losses pursuant to 18 U.S.C. § 3664(d)(5). *Pearson*, 570 F.3d at 486-87.

[16] 18 U.S.C. § 2259(b)(2).

[17] 18 U.S.C. § 3663A(b)(2)(C) & (b)(4).

restitution for lost income would only be available for victims of crimes involving bodily injury or victims who lose income as a result of participating in proceedings related to the offense.

On the other hand, § 2259 itself lists the forms of restitution available to the victims of specific crimes such as the crimes involved in this case. In contrast to the MVRA, § 2259 lists "lost income" as a form of restitution without further qualification or limitation. The section does not distinguish crimes involving bodily injury or narrow the scope of lost income only to participation in official proceedings like the MVRA. What is more, had Congress intended to limit the recovery of lost income under § 2259 to the specific instances set out in the MVRA, it could have said so without including one list of available forms of restitution in § 2259 and a slightly different list in the more general MRVA. Indeed, why have a separate restitution statute for specific crimes if the same forms of recovery were already available under the MVRA? There are any number of reasons to believe that Congress recognized the need for a broader measure of restitution for victims of specific crimes involving sexual exploitation. The nature of these crimes is such that the injuries can be either bodily or psychological or both. Psychological injuries in particular may continually manifest in the victims long after the exploitative act is complete. In that sense, the MVRA's provision for lost income only in crimes involving bodily injury is rendered meaningless in acts of sexual exploitation. Above all, these laws protect minors, a most vulnerable class of persons, from predatory acts of sexual exploitation and should therefore be given their broadest possible construction. If the Court were to read § 2259 through the more narrow lens of the MVRA, the Court would risk ignoring the distinct purposes of § 2259. For these reasons, the Court finds that a victim of a specified crime under § 2259 may recover lost income regardless of whether the crime at issue involved

bodily harm.

The Court finds that the government has established that S.S. is entitled to lost income as a proximate result of Defendant's criminal acts. S.S. seeks restitution for $62,000.00 in lost income. Without addressing each of the assumptions for the victim's calculations, the Court finds them problematic. For example, Stahl testified that S.S. assumed that she would have obtained full-time employment upon reaching age 18 and that with a junior college degree, S.S. would have earned $25,000 per year. But there was no evidence to support the assumption that S.S. would have already held a junior college degree at age 18. In fact, the evidence showed that prior to Defendant's crimes against her, S.S. was a full-time high school student and would not have received her high school diploma for some time yet. Therefore, the government has failed to show that S.S. would have earned $25,000 per year by the time she reached age 18 but for Defendant's acts of exploitation.

The evidence did show, however, that S.S. was employed part-time prior to Defendant's illicit meeting with her in California in September 2005. In fact, S.S. stated that she had obtained the employment for the purpose of raising money so that Defendant could make the trip. After her ill-fated encounter with Defendant, S.S. testified that she began to experience emotional problems, which cost her the part-time job. There is evidence then that S.S. at least had employment and could have continued to work had she not begun to suffer the effects of Defendant's scheme after September 2005. Other evidence also indicated that S.S. had plans to finish high school and then go on to college to pursue studies in child psychology. Even if she had never met Defendant, these facts imply that S.S. would likely have worked part-time in a minimum wage job not only for the rest of her high school years but also into college.

Based on these findings, the Court holds that the appropriate measure of lost wages should be based on the evidence that S.S. was employed part-time working approximately twenty (20) hours per week at minimum wage and would have continued to be so employed through age 20. S.S. was born in May 1989, and so at the time of her encounter with Defendant in September 2005, S.S. was age 16 and 4 months. According to the California Department of Industrial Relations, the minimum wage by law in the state of California in 2005 was $6.75.[18] The Court also notes that California has gradually increased its minimum wage to its current rate of $8.00 per hour[19]; however, the government presented no evidence of S.S.'s actual wages in the jobs she did hold. Furthermore, the proof did not establish the actual time periods when S.S. was employed or what the minimum wage in effect was during those time periods. For the sake of simplicity, the Court will therefore base its calculation of lost income on the minimum wage of $6.75 in effect in 2005.

By September 16, 2005, the day on which Defendant traveled to meet S.S. in California, there were 15 weeks left in the year. S.S. testified that she had been working at least 20 hours per week at minimum wage, which means S.S. would have had gross earnings of $2,025.00 for the rest of 2005 had she been able to work the rest of the year. Assuming that S.S. would have continued to work 20 hours per week for the years 2006 through 2008, the Court finds that she would have earned $7,020.00 in gross income for each year. S.S. testified that she had maintained a part-time job from November 2009 through the present earning $8.55 per hour, and

---

[18] Calif. Indus. Welfare Comm'n, *History of California Minimum Wage*, Calif. Dept. Indus. Rel., www.dir.ca.gov/Iwc/MinimumWageHistory.htm. *See* Fed. R. Evid. 201(b).

[19] *Id*.

14

so the Court need not calculate her potential earnings for that period. From January through October 2009, a span of 43 weeks, S.S.'s part-time gross earnings would have been $5,805.00. In sum, the Court finds that S.S. total gross earnings from September 2005 through October 2009 would have been $28,890.00.

The evidence further showed that S.S. did maintain some employment during the relevant time periods. For purposes of restitution, the Court will reduce the award by the amount of estimated earnings S.S. did realize. The Court's analysis is complicated by the fact that the government did not offer proof of S.S.'s income during the relevant periods. The Court did hear testimony from S.S. about the rough amounts of time she was able to work during each year of her life since 2005. Based on that testimony the Court holds that her testimony satisfies the "slightly relaxed standard" of "a rule of reasonableness" inherent in a the determination of a victim's restitution. According to her testimony, S.S. worked approximately four months, or 8 weeks, at age 17. She was able to work three and one-half months, or 11 weeks, at age 18. Finally, S.S. stated that she worked about ten months, or 42 weeks, at age 19. S.S. testified that she worked approximately 20 hours per week at all times. Assuming a minimum wage of $6.75 per hour, the Court estimates that S.S.'s actual gross earnings were $8,235.00 between September 2005 and October 2009.

Allowing for her actual earnings, the Court finds that S.S. is entitled to restitution for lost income in the amount of $20,655.00.

## **CONCLUSION**

The Court finds that restitution is mandatory in this case and that S.S. was a victim of Defendant's criminal acts. The Court has found that S.S. is entitled to restitution in the

following amounts: $5,000.00 (for property loss); $1,000.00 (monetary loss); $38,080.00 (future medical expenses); and $20,655.00 (lost income). Defendant is ordered to make restitution to S.S. in a total amount of $64,735.00 in a single, lump-sum payment pursuant to 18 U.S.C. § 3664(f)(3)(A).

Finally, 18 U.S.C. § 3664(f)(1)(B)(2) states that after the Court has determined that restitution must be made,

> the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of–
> 
> > (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
> > (B) projected earnings and other income of the defendant; and
> > (C) any financial obligations of the defendant; including obligations to dependents.

Additionally, the statute gives the Court the discretion to direct the probation officer to prepare a report which should include among other things "information relating the economic circumstances of [the] defendant."[20]

Therefore, the Court directs the probation officer to prepare a report containing the financial resources and other assets of Defendant, including whether any of his assets are jointly controlled; projected earnings and other income of Defendant; and any financial obligations of the defendant, including obligations to dependents. In aid of the probation officer's report, Defendant shall prepare and file with the probation officer an affidavit fully describing the

---

[20] § 3664(a). *See also United States v. Davis*, 306 F.3d 398, 426 (6th Cir. 2002) ("Our holding does not preclude the district court from eliciting the assistance of others in setting such a schedule.").

financial resources of Defendant, including a complete listing of all assets owned or controlled by Defendant as of the date on which Defendant was arrested, and the financial needs and earning ability of Defendant and Defendant's dependents, if any.  Defendant shall provide this affidavit within fourteen (14) days of the entry of this Order.  The probation officer's report shall be due within thirty (30) days of the entry of this Order.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 4th, 2010.